2008 UT App 41

UHRHAHN CONSTRUCTION & DESIGN, INC., a corporation, Plaintiff and Appellee,

v.

Lamar HOPKINS and Joan B. Hopkins, Defendants and Appellants.

Lamar Hopkins and Joan B. Hopkins, Trustees of the Joan B. Hopkins Family Trust, Third-party Plaintiffs and Appellants,

v.

Roger Uhrhahn, Third-party Defendant and Appellee.

No. 20060616–CA.

Court of Appeals of Utah.

Feb. 22, 2008.

Ray G. Martineau, Anthony R. Martineau, and Brett D. Cragun, Salt Lake City, for Appellants.

Nan T. Bassett, Salt Lake City, for Appellee.

Before Judges BILLINGS, McHUGH, and ORME.

## OPINION

ORME, Judge:

¶ 1 Lamar Hopkins (Hopkins) and Joan B. Hopkins, individually and as trustees (the homeowners), appeal from a judgment, entered following a bench trial, by which the trial court ruled in favor of Uhrhahn Construction & Design, Inc. on its mechanic's lien and breach of contract claims.[1] This case presents the issue, among others, of whether parties to a construction contract can orally agree on extra work to be performed when the written contract contains a provision requiring change orders or "extras" to be put in writing. We affirm the trial court's breach of contract determination, reverse its mechanic's lien and attorney fees rulings, and remand for a determination of the homeowners' attorney fees, limited to those fees incurred in litigating the timeliness of the mechanic's lien enforcement action.

## BACKGROUND [2]

■ ¶ 2 This dispute involves Uhrhahn's written proposals for the partial construction of the homeowners' house, in which Uhrhahn estimated the cost and specifications for multiple projects it would complete. Each proposal stated that "[a]ny alteration or deviation from above specifications involving extra costs will be executed only upon written orders." Hopkins signed the proposals under sections titled "Acceptance of Proposal." [3]

¶ 3 The trial court found that "Hopkins ... made several requests for additional work to the home which [were] not included in the initial proposals," and that "Uhrhahn ... completed a substantial amount of the additional work requested." Hopkins paid for work performed in connection with at least three of the additional requests, only one of which may have been in writing.[4]

¶ 4 The trial court further found that "[d]uring the initial bidding process, Mr. Hopkins requested installation of Durisol blocks on the home rather than standard cinder blocks." "[He] represented to [Roger] Uhrhahn ... that the Durisol blocks were easier to install than traditional cinder

---

1. At trial, Uhrhahn Construction & Design, Inc. was the plaintiff, and Roger Uhrhahn was the third-party defendant. We do not address the trial court's rulings on the homeowners' counterclaim or third-party claims because the homeowners did not brief those issues. Accordingly, we refer to Uhrhahn Construction & Design, Inc., the only appellee whose arguments we address, as "Uhrhahn." At times, we also refer to Roger Uhrhahn, individually, to discuss his interaction with Hopkins.

2. One of the homeowners' challenges on appeal is that the trial court's factual findings do not support its legal conclusions. As they do not challenge the validity of the factual findings themselves, we accept the trial court's factual findings as true and analyze its legal conclusions based on those findings. See Carsten v. Carsten, 2007 UT App 174, ¶ 7, 164 P.3d 429. We note, however, that the trial court's express findings of fact are very sparse and do not have the depth and detail that we prefer to see. For reasons that we will discuss in more detail later in this opinion, we recite the facts in accordance with the trial court's factual findings, the trial court's

September 19, 2005 memorandum decision, and Uhrhahn's closing argument brief and exhibits, to which the trial court referred in its decision. Our recitation of some facts that are not included in the trial court's explicit factual findings is based on our conclusion that the trial court necessarily considered and found these facts implicitly even though it did not expressly include them in its final order. See Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp., 1999 UT App 91, ¶¶ 17–18, 977 P.2d 541.

3. Hereinafter, we will refer to the accepted proposals collectively as the "proposal agreement."

4. The homeowners state in their reply brief that "the parties followed the contractually mandated procedure on at least one occasion" and that "Hopkins paid for the additional work set forth in a written change order." We are not sure to which change order they are referring. However, we note that Uhrhahn's records, which were an exhibit to its closing argument brief, show that Uhrhahn sent three invoices to Hopkins, labeled change orders 1, 2, and 3, and that these invoices were paid.

block and would take half the time." He also "gave [Roger] Uhrhahn written information about the blocks, which turned out to be incomplete." The trial court found that the Durisol blocks Hopkins provided for Uhrhahn to install "were deformed, requiring [Uhrhahn] to expend a substantial amount of additional time to install the blocks, above and beyond the initial proposal amount." This increased installation time caused Uhrhahn to incur expenses above its original estimation for the Durisol block project.

¶ 5 The dispute that ensued over the Durisol blocks led to the deterioration of the parties' relationship. Hopkins refused to pay Uhrhahn for the extra cost incurred while installing the deformed blocks, and Uhrhahn refused to continue working if it was not paid. For reasons that are not entirely clear, Uhrhahn did continue to work on the house, probably because Roger Uhrhahn was under the impression that Hopkins would pay after Uhrhahn provided "a complete breakdown and analysis of all costs to date, including additions, with documentation." After Uhrhahn provided the detailed information, Hopkins still refused to pay.

¶ 6 On March 28, 2003, Uhrhahn filed a complaint in district court "to collect a debt and to foreclose on a Mechanic's lien" pursuant to Utah Code section 38–1–11, see Utah Code Ann. § 38–1–11 (Supp.2001).[5] The homeowners then filed an answer, counterclaim, and third-party complaint, alleging breach of contract and wrongful lien, and seeking punitive damages and attorney fees. After a bench trial, the court entered a memorandum decision on September 15, 2005, ruling in favor of Uhrhahn on its claims and against the homeowners on theirs. The trial court directed Uhrhahn to prepare findings of fact and conclusions of law following a damages hearing. After the damages hearing held on February 22, 2006, the homeowners objected to Uhrhahn's proposed factual findings because the findings failed to indicate whether or not the mechanic's lien was timely filed. The trial court entered its final factual findings and conclusions of law

on June 7, 2006, without addressing the homeowners' concern, and they now appeal the court's final order.

## ISSUES AND STANDARDS OF REVIEW

¶ 7 The first issue is whether the parties entered into a contract implied in fact that allowed them to agree orally to changes and extra work that deviated from the proposal agreement. Whether a contract implied in fact exists is generally considered a question of fact, and we review a trial court's factual findings under the deferential clearly erroneous standard. See Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 401 (Utah 1998); Sorenson v. Kennecott–Utah Copper Corp., 873 P.2d 1141, 1144 (Utah Ct.App. 1994). However, we " 'retain[ ] the power to decide whether, as a matter of law, a reasonable [fact finder] could find that an implied contract exists.' " Ryan, 972 P.2d at 401 (quoting Sanderson v. First Sec. Leasing Co., 844 P.2d 303, 306 (Utah 1992)). As our review of this matter is limited to the trial court's factual findings, which we accept as valid, we will be determining whether an implied-in-fact contract exists as a matter of law in light of those findings.

¶ 8 The second issue is whether the trial court's damages award was proper given the lack of explicit factual findings regarding the award. "[An] award of damages is a factual determination that we review for clear error." Saleh v. Farmers Ins. Exch., 2006 UT 20, ¶ 29, 133 P.3d 428.

¶ 9 The third issue is whether the trial court, albeit only implicitly, correctly determined that Uhrhahn timely filed its mechanic's lien enforcement action under Utah Code section 38–1–11. See Utah Code Ann. § 38–1–11(1)(b) (Supp.2001) (current version at Utah Code Ann. § 38–1–11(2) (Supp. 2007)). "[S]tatutory interpretation [presents] a question of law that we review for correctness." Sill v. Hart, 2007 UT 45, ¶ 5, 162 P.3d 1099.

---

5. The dispute at issue arose during the fall of 2002, and Uhrhahn filed its mechanic's lien in March 2003. At trial, the court and parties appropriately relied on the version of the mechan-

ics' lien statute then in effect, and we do the same. Section 38–1–11 has subsequently been amended several times. See Utah Code Ann. § 38–1–11 amend. notes (2005 & Supp.2007).

¶ 10 Finally, in light of our disposition of the third issue, the fourth issue is whether the homeowners were the successful party in the mechanic's lien action, thus entitling them to attorney fees under Utah Code section 38–1–18. *See* Utah Code Ann. § 38–1–18(1) (Supp.2001) (current version at Utah Code Ann. § 38–1–18(1) (2005)). Attorney fee determinations that involve statutory interpretation present questions of law. *See A.K. & R. Whipple Plumbing & Heating v. Guy,* 2004 UT 47, ¶ 6, 94 P.3d 270 ("When reviewing attorney fee decisions that involve questions of law, we review for correctness. This is also the standard we apply when construing statutes.") (citations omitted).

## ANALYSIS

### I. Contractual Issues

### A. The Proposal Agreement Was a Contract

¶ 11 The homeowners argue that the trial court improperly determined that the proposal agreement was just an estimation of the work Uhrhahn would perform and not a contract. However, based on our review of the trial court's findings of fact and conclusions of law, it appears that the trial court did not actually determine whether or not the proposal agreement was a binding contract. In the trial court's memorandum decision, it indicated "that the proposals ... submitted ... were estimates of the amount that would be charged for the completion of the job." Then, in its conclusions of law, it stated: "Even if the bid proposals constituted a contract, based upon Mr. Hopkins' misrepresentations and conduct in continually requesting additional work ... Plaintiff was entitled to consider the contract voidable." These statements indicate that the trial court did not decide the issue. Nonetheless, we agree with the homeowners that the court made an inconsistent statement when it concluded that Uhrhahn could recover "under both express and implied contracts." But

because the existence of a contract is a legal determination, *see Carter v. Sorensen,* 2004 UT 33, ¶ 6, 90 P.3d 637 ("We determine the existence of a contract ... by resorting to principles of law[.]"); *Herm Hughes & Sons, Inc. v. Quintek,* 834 P.2d 582, 583 (Utah Ct.App.1992) ("Whether a contract exists between parties is a question of law[.]"), and because we can readily determine whether the proposal agreement was a contract from the documents themselves, we conclude that the signed proposal agreement was an enforceable contract between the parties.[6]

¶ 12 The essential elements of contract formation were present here. *See Golden Key Realty, Inc. v. Mantas,* 699 P.2d 730, 732 (Utah 1985) (indicating that the essential elements of a contract include "offer and acceptance, competent parties,[7] and consideration"). The proposal constituted an offer by Uhrhahn to complete certain detailed construction projects for certain prices, and it clearly set forth additional terms regarding the work and the parties' relationship. *See DCM Inv. Corp. v. Pinecrest Inv. Co.,* 2001 UT 91, ¶ 12, 34 P.3d 785 ("A bona fide offer is one made in good faith which, on acceptance, would be a valid and binding contract. For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous.") (citations omitted). When Hopkins signed the written proposal multiple times—once for each proposed project under sections titled "Acceptance of Proposal"—he accepted Uhrhahn's offer and promised to pay the amounts delineated for the various projects. *See Nunley v. Westates Casing Servs., Inc.,* 1999 UT 100, ¶ 27, 989 P.2d 1077 (" 'An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer.' ") (quoting *Cal Wadsworth Constr. v. City of St. George,* 898 P.2d 1372, 1376 (Utah 1995)). Uhrhahn's promise to perform and the homeowners' promise to pay constituted bargained-for consideration. *See Continen-*

---

6. Despite the ambiguity in the trial court's ruling on this issue, its main determinations—that a contract implied in fact existed and that Uhrhahn could recover damages for the extra work it performed at Hopkins's request based on the implied contract—remain valid.

7. Whether the parties were competent is not in dispute.

*tal Ill. Nat'l Bank & Trust Co. of Chicago v. Allen,* 811 P.2d 168, 173 n. 1 (Utah 1991) (" 'To constitute consideration, a performance or a return promise must be bargained for.' ") (quoting Restatement (Second) of Contracts § 71(1) (1981)). Thus, a valid contract was formed between the parties.

### B. Contract Implied in Fact

¶ 13 The homeowners challenge the trial court's determination that an implied-in-fact contract existed. They argue that the proposal agreement, which requires any changes to the original estimates and specifications to be put in writing, controls. They therefore assert that they do not owe Uhrhahn for work or monetary amounts that deviated from the original proposal agreement and were not reduced to writing. We disagree. We conclude that the trial court's express and implicit factual findings show that through his conduct Hopkins, and therefore the homeowners, implicitly waived the provision requiring change orders to be put in writing and created a contract implied in fact that permitted changes to the original contract to be made orally.

¶ 14 First, we note that parties to construction contracts frequently make changes to the project as originally agreed upon. As stated in *Corbin on Contracts,*

[i]t must be a rare case in which parties to [construction] contracts do not find reason for variation or addition after the work is in progress. The owner changes his mind and the architect gives new directions. It is universal custom to rely upon the spoken word in such cases; the oral modification is enforced and compensation for "extra work" adjudged.

6 Arthur Linton Corbin, *Corbin on Contracts* § 1294, at 203 (West Publishing Co.1962) (1951). Additionally, provisions in construction contracts requiring orders for extra work to be written are generally held to be for the protection of the owner, and the owner can waive such provisions. *See Campbell Bldg. Co. v. State Rd. Comm'n,* 95 Utah 242, 70 P.2d 857, 864 (1937) ("The general rule is that a provision in a contract that all extra work, in order to be paid for, shall be ordered by the architect or engineer in writ-

ing, may be waived by the owner."). *See also* 4 Samuel Williston, *A Treatise on the Law of Contracts* § 591, at 205–06 (Walter H.E. Jaeger ed., 3d ed., Baker, Voorhist & Co., Inc.1961) (1920) (discussing that "stipulations in ... construction contracts requiring written orders ... for extra work ... may be avoided by the parties," that "[a] waiver of such stipulation by the owner is the theory on which it is most frequently avoided," and that an owner may either explicitly or implicitly waive the provision through his or her conduct) (footnote and internal quotation marks omitted).

¶ 15 To prove that the owner intended to waive such a provision, "the evidence must be of a clear and satisfactory character and clearly show a distinct agreement that the work be deemed extra work and a definite agreement with the owner to pay extra for such extra work." *Campbell Bldg. Co.,* 70 P.2d at 865. "This is a fact question to be determined by the court or the jury as the case may be." *Id.*

¶ 16 Utah has recognized that such a provision can be waived explicitly or implicitly, with the requisite showing. *See Richards Contracting Co. v. Fullmer Bros.,* 18 Utah 2d 177, 417 P.2d 755, 755 (1966) (discussing that a contract provision requiring written authorization for extra work is controlling, "except where the contractor verbally encourages the subcontractor to do the extra work with the express or implied promise that it would be paid for"). *See also* 4 Samuel Williston, *A Treatise on the Law of Contracts* § 591, at 206 (Walter H.E. Jaeger ed., 3d ed., Baker, Voorhist & Co., Inc.1961) (1920) (discussing that a waiver may be found based on "the owner's knowledge of, agreement to, or acquiescence in such extra work, a course of dealing which repeatedly disregards such stipulation, and a promise to pay for extra work, orally requested by the owner and performed in reliance thereon") (footnote and internal quotation marks omitted).

¶ 17 In *Richards Contracting,* the Utah Supreme Court upheld a jury verdict in favor of a subcontractor on his claim for damages against a contractor, even though he did not obtain the contractually required written au-

thorization for the extra work, because the subcontractor "did work in excess of his contract with [the contractor], at the latter's request or acquiescence." 417 P.2d at 755. In that case, the contractor paid the subcontractor for a portion of the extra work performed. *See id.* The facts of *Richards Contracting* are similar to those here, except that this case involves a landowner and a contractor rather than a contractor and a subcontractor. The trial court's factual findings clearly and satisfactorily show that Hopkins implicitly waived the writing requirement when he regularly, requested extra work orally; accepted the benefits of the extra work; and paid for some of the extra work after receiving invoices labeled change orders for such work.[8]

¶ 18 We also conclude that the trial court correctly determined that an implied-in-fact contract was established through the parties' conduct, which allowed the parties to agree on extra work orally. *See id.* (concluding that when "the parties decide on extras," as happened in that case, "another contract in quasi contract arises based on a so-called quantum meruit theory").

> A contract implied in fact is the second branch of quantum meruit. A contract implied in fact is a "contract" established by conduct. The elements ... are: (1) the defendant requested the plaintiff to perform work; (2) the plaintiff expected the defendant to compensate him or her for those services; and (3) the defendant knew or should have known that the plaintiff expected compensation.

*Davies v. Olson,* 746 P.2d 264, 269 (Utah Ct.App.1987) (citations omitted). In a similar case involving a contractor and subcontractor, this court determined that an implied-in-fact contract existed. *See Gary Porter Constr. v. Fox Constr., Inc.,* 2004 UT App 354, ¶¶ 3, 17, 22, 101 P.3d 371, *cert. denied,* 123 P.3d 815 (Utah 2005). The *Gary Porter* decision affirmed the trial court's grant of summary judgment because the undisputed facts established that all three of the implied-in-fact contract elements were met. *See id.* ¶ 22. The undisputed facts

showed that the contractor repeatedly asked the subcontractor to perform work outside the subcontract; that the subcontractor performed all work requested under the original subcontract and additional orders; that the contractor paid itemized bills that listed the work and costs; and that "[the contractor] acknowledged that [the subcontractor] was performing work outside the subcontract." *Id.* ¶¶ 18–19, 21.

¶ 19 In contrast, in another case involving a similar issue, *ProMax Development Corp. v. Mattson,* 943 P.2d 247 (Utah Ct.App.), *cert. denied,* 953 P.2d 449 (Utah 1997), this court determined that an implied-in-fact contract did not exist when the contractor did not inform the owner that it was going over budget. *See id.* at 259. The court reasoned that an implied-in-fact contract did not exist because the owner neither knew nor should have known that extra work was being performed for which the contractor expected to be paid. *See id.*

¶ 20 In this case, as in *Gary Porter,* the trial court's factual findings show that the parties' conduct established an implied-in-fact contract. The trial court found that Hopkins "made several requests for additional work to the home," and that "Uhrhahn ... completed a substantial amount of the additional work requested." Additionally, the trial court stated that Hopkins "accept[ed] the benefits of [Uhrhahn]'s hard work." Moreover, Hopkins paid at least three different invoices for the additional work, which invoices itemized the extra (or additional) work performed by Uhrhahn.

¶ 21 The first element is clearly satisfied because Hopkins repeatedly asked Uhrhahn to perform construction work that deviated from the proposal agreement. The second element is also satisfied because Uhrhahn's conduct shows that it expected payment in return for the work it performed at Hopkins's request. Hopkins and Uhrhahn had a business relationship, and Uhrhahn was hired by Hopkins to perform a job. Under these circumstances, Uhrhahn clearly expected to be paid for any work it performed at

---

8. There is no dispute that some of the work Uhrhahn performed, and for which it was paid, was work that was not included in the proposal agreement.

the homeowners' request, as shown by the regular invoices it sent Hopkins for its completed work, including invoices for the additional work orally requested by Hopkins. Finally, the last element is also satisfied because Hopkins's conduct showed he knew Uhrhahn expected to be paid. Up until the dispute over the Durisol blocks ensued, Hopkins paid or partially paid for the work that deviated from the proposal agreement pursuant to Uhrhahn's invoices that referenced change orders. His payments clearly show that he knew Uhrhahn expected to be paid. Thus, the trial court correctly determined that a contract implied in fact existed, which Hopkins—and therefore the homeowners—breached when they failed to completely pay Uhrhahn for the extra work performed.

### C. Damages

¶ 22 The trial court did not discuss damages in its factual findings, and its determination that the homeowners owed Uhrhahn damages totaling $62,386.29 therefore appears, at first blush, to spring out of nowhere. Ordinarily, although the precision of the amount expressed by the court inspires confidence at an intuitive level, such a situation would require us to remand for the entry of adequate findings of fact to support the damages award. *See Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp.*, 1999 UT App 91, ¶ 17, 977 P.2d 541 (" 'It is well settled that the trial court should make findings on all material issues tried by the parties, and a failure to do so is generally considered reversible error and requires a remand.' ") (quoting *Kinkella v. Baugh*, 660 P.2d 233, 236 (Utah 1983)). In this case, however, we are reluctant to remand for a correction of the factual findings because the trial judge is no longer on the bench and because our doing so can be characterized as a meaningless exercise given that we can readily see how the trial court reached its determination based on its implicit factual findings. *See id.* (discussing that a failure to make factual findings does not require remand if the error is harmless, which "can occur [in] two ways: (1) if the undisputed evidence clearly establishes the factor or factors on which the findings are missing, or (2) even given controverted evidence . . . if the absent findings

can reasonably be implied") (citation and internal quotation marks omitted) (second alteration in original).

¶ 23 We conclude that the trial court implicitly made findings that fully support its damages award to a mathematical certainty. " 'Unstated findings can be implied if it is reasonable to assume that the trial court actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made.' " *Id.* ¶ 18 (quoting *Hall v. Hall*, 858 P.2d 1018, 1025 (Utah Ct.App.1993)). On the other hand, "[f]indings . . . may *not* be implied . . . when the ambiguity of the facts makes such an assumption unreasonable. This court [has] held that we will not imply any missing finding where there is a matrix of possible factual findings and we cannot ascertain the trial court's actual findings." *Id.* (quoting *Hall*, 858 P.2d at 1025–26) (internal quotation marks omitted) (emphasis and fourth alteration in original).

¶ 24 In the trial court's memorandum decision, it "note[d] that the factual overview and legal arguments presented in [Uhrhahn]'s Closing Argument Brief are generally consistent with this Court's findings of fact and conclusions of law." Additionally, the trial court later stated that "[b]ased on the foregoing and for reasons more specifically articulated in [Uhrhahn]'s Closing Argument Brief, the Court rules in favor of [Uhrhahn] and against the defendants[.]" The trial court then determined that Uhrhahn was "entitled to damages for work performed under both express and implied contracts with the defendants (and more specifically with Mr. Hopkins)." After referencing Uhrhahn's preliminary damages calculation in its Closing Argument Brief, the trial court reserved ruling on the damages issue until it held a hearing on damages. At the February 22, 2006, damages hearing, Uhrhahn presented an amended version of the damages calculations originally set forth in its Closing Argument Brief, correcting an error it had concededly made. The trial court gave the homeowners time to object to those calculations, and they did so on March 1, 2006. In its May 23, 2006, ruling on the matter, after

considering the homeowners' objection and Uhrhahn's response, the trial court stated: "[H]aving reviewed [Uhrhahn]'s Damages Summary, as modified by [its] Response to the [homeowners'] Objection, the Court awards [Uhrhahn] $119,991.06 in [total] damages, attorney's fees and costs (less paralegal fees) and pre-judgment interest."

¶ 25 The trial court's September 15, 2005, memorandum decision clearly shows that it considered and agreed with Uhrhahn's arguments and analysis with regard to its contractual claims, including its analysis regarding whether damages should be awarded. Moreover, the trial court's damages ruling, entered on May 23, 2006, shows that it considered and necessarily found that Uhrhahn's calculations, submitted at the damages hearing and in response to the homeowners' objection, reflected the amount of damages owing. Accordingly, even though the trial court's express factual findings do not detail how the damages award was calculated, we can readily determine how those numbers were reached by reviewing the calculations that Uhrhahn submitted, which the trial court considered and accepted. We additionally note that the amount of damages allocable to the breach of contract claim was $62,386.29,[9] and that only $12,231.58 of this amount was attributable to extra work and extra costs, including work performed and costs incurred while installing the deformed Durisol blocks.[10] The calculations show that the remainder of the damages award was for work called for under the proposal agreement and for a lien Uhrhahn paid after Hopkins ordered supplies from a supplier using Uhrhahn's account.[11] Finally, we emphasize

---

9. The trial court awarded a total of $119,991.06 in damages, attorney fees, costs, and prejudgment interest, itemized as follows: (1) $62,386.29 in principal damages; (2) $36,945.86 in attorney fees and costs pursuant to the mechanics' lien statute; and (3) $20,658.91 in prejudgment interest.

10. The trial court's memorandum decision shows that it awarded damages for the expenses Uhrhahn incurred while installing the Durisol blocks because Hopkins provided deformed blocks and misrepresented the ease of installation and the length of time it would take to install the blocks, which caused Uhrhahn to underestimate the amount of money it would take to complete the project. In the trial court's legal conclusions, in ruling against the homeowners on their breach of contract and wrongful lien claims, the court stated that "[e]ven if the bid proposals constituted a contract," Uhrhahn "was entitled to consider the contract voidable" because of "Mr. Hopkins' misrepresentations and conduct."

   While the homeowners generally challenge the trial court's damages award as including extra expenses that were not in the proposal agreement or in later written agreements, their arguments focus on the trial court's conclusion that an implied-in-fact contract existed regarding change orders or work that deviated from the proposal agreement. Their brief does not specifically address the separate issue of whether Uhrhahn was entitled to recover the extra expense it incurred in installing the Durisol blocks, a project that was originally included in the proposal agreement. The homeowners refer to the legal conclusion discussed above to point out the trial court's inconsistent statements about whether the proposal agreement was a contract, and to argue that if the contract was considered voidable by Uhrhahn, then the mechanic's lien could not be valid because there was no underlying contract. As indicated in section I(A) of this opinion, we have determined that the proposal agreement was a contract. And it is not necessary for us to address the homeowners' argument regarding the effect this statement has on the validity of the mechanic's lien in light of our disposition of that issue under section II(A) of this opinion. Finally, because the homeowners do not adequately brief the misrepresentation issue or even specifically discuss whether the extra expenses for installing the Durisol blocks were appropriately included in the damages award, we do not further discuss the issue and affirm the trial court's inclusion of those expenses in its damages award. *See Valcarce v. Fitzgerald*, 961 P.2d 305, 313 (Utah 1998).

11. Because, as we previously concluded in section I(A) of this opinion, the proposal agreement was a contract, the award of damages for unpaid work under the original agreement is sustainable. *See DeBry v. Noble*, 889 P.2d 428, 444 (Utah 1995) ("It is well-settled that an appellate court may affirm a trial court's ruling on any proper grounds, even though the trial court relied on some other ground."). We additionally note that when the homeowners objected to Uhrhahn's damages calculations before the trial court, they only "object[ed] to the submission and award of costs and attorney fees in favor of [Uhrhahn] in this matter on the grounds that [Uhrhahn] failed to prove its entitlement to costs and attorney fees under the Utah Mechanics' Lien statute or any other basis." On appeal, they generally request that we remand for a determination of damages based just on the proposal agreement and do not appear to challenge the award for unpaid work Uhrhahn performed under the proposal agreement.

that we are only affirming the trial court's damages award—not its award of attorney fees and costs—because, as discussed below, we reverse the trial court's mechanic's lien ruling.

## II. Mechanic's Lien

### A. Late Filing

¶ 26 The trial court, in its conclusions of law, determined that Uhrhahn could recover under both its mechanic's lien and implied contract claims, and it awarded attorney fees under the mechanics' lien statute. The homeowners argue that the trial court erred because no evidence was presented showing that Uhrhahn timely filed its action to enforce the mechanic's lien. They further assert that the trial court's legal conclusion that a valid mechanic's lien existed was not supported by its factual findings because the findings do not indicate the last date on which Uhrhahn performed work or delivered materials.

■ ¶ 27 We conclude—and Uhrhahn concedes—that the express and implied factual findings do not indicate the last date of work or delivery on the Hopkins project. Rather, the factual findings just discuss the substantive issues necessary to prove the mechanic's lien and breach of contract claims, and then the trial court states the legal conclusion that "[Uhrhahn] has satisfied the requisite elements of Utah Code Ann. § 38–1–1, et seq."

¶ 28 The applicable version of Utah Code section 38–1–11(1)(b) provided that "[a] lien claimant shall file an action to enforce the lien filed under this chapter within: ... 180 days from the date the lien claimant last performed labor and services or last furnished equipment or material for a residence, as defined in Section 38–11–102." Utah Code Ann. § 38–1–11(1)(b) (Supp.2001) (current version at Utah Code Ann. § 38–1–11(2) (Supp.2007)). The homeowners assert that Uhrhahn's trial testimony established that the last date any work was performed on the residence was September 26, 2002. Uhrhahn filed its complaint and mechanic's lien enforcement action on March 28, 2003. Thus, if September 26 was the last day of work, the

mechanic's lien action was filed three days late, i.e., 183 days after the last date of work. Rather than countering the homeowners' argument in its brief by providing record cites that show a different last date of work or delivery, Uhrhahn asks that we remand the case for further proceedings to resolve this issue. It seeks "an evidentiary hearing before a new judge" where "the parties [could] point to all evidence presented at trial" on the issue and then the judge could make appropriate factual findings.

■ ¶ 29 Generally, when a trial court fails to make factual findings on a material issue, such failure constitutes reversible error, and we remand to the trial court to enter the necessary findings unless we determine that such error is harmless, i.e., the undisputed evidence clearly establishes the missing findings or the missing findings may reasonably be implied. *See State v. Ramirez,* 817 P.2d 774, 787 n. 6 (Utah 1991). *See also Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp.,* 1999 UT App 91, ¶¶ 17–18, 977 P.2d 541. But, if the error is harmless, we affirm the judgment in the interest of judicial economy. *See Ramirez,* 817 P.2d at 787–88 & n. 6; *Colonial Pac. Leasing Corp.,* 1999 UT App 91, ¶¶ 17–18, 977 P.2d 541. In this case, Uhrhahn points to nothing in the record to aid us in determining whether the failure to include a finding as to the last date that work was performed was harmless. An appellee's brief, like an appellant's, must set forth "the contentions and reasons of the [appellee] with respect to the issues presented ... with citations to the authorities, statutes, and parts of the record relied on." Utah R.App. P. 24(a)(9), (b).

¶ 30 The homeowners argued at length regarding this issue, and their arguments stand unrefuted by Uhrhahn. While alleging at oral argument that some facts in the record support a finding that the mechanic's lien was timely filed, Uhrhahn did not provide any record cites for such evidence. We accordingly conclude that Uhrhahn did not adequately brief this issue. Without particularized support for its contention that evidence of record contradicts the September 26, 2002, date to which the homeowners point us, we are unable to determine whether affirmance

or at least remand for findings relative to timeliness is in order. *See id. See also Valcarce v. Fitzgerald,* 961 P.2d 305, 313 (Utah 1998) ("[A]n appellate court will decline to consider an argument that a party has failed to adequately brief."). Under the facts as the homeowners assert them, which remain uncontradicted by the trial court's factual findings and Uhrhahn's arguments on appeal, the lien enforcement action was not timely filed, and the legal conclusion that a valid mechanic's lien existed is therefore in error. We accordingly reverse the trial court's determination that Uhrhahn had an enforceable mechanic's lien.

## B. Attorney Fees

¶ 31 In light of our disposition of the mechanic's lien issue, we also reverse the trial court's award of attorney fees to Uhrhahn under section 38–1–18(1). *See* Utah Code Ann. § 38–1–18(1) (Supp.2001) (current version at Utah Code Ann. § 38–1–18(1) (2005)). Additionally, the trial court's determination that Uhrhahn "is further entitled to an order for the s[ale] of the property at issue pursuant to U.C.A. § 38–1–15," *see id.* § 38–1–15 (Supp.2001) (current version at Utah Code Ann. § 38–1–15 (2005)), is also vacated as the mechanic's lien enforcement action was not shown to be timely filed.

¶ 32 The homeowners assert that if they prevail on the timeliness issue on appeal, they should be awarded attorney fees under the mechanics' lien statute. *See id.* § 38–1–18(1) (Supp.2001). Utah Code section 38–1–18(1) provided:

(1) Except as provided in Section 38–11–107 and in Subsection (2), in any action brought to enforce any lien under this chapter the successful party shall be entitled to recover a reasonable attorneys' fee, to be fixed by the court, which shall be taxed as costs in the action.

*Id.* This "provision mandates that the successful party be allowed to recover reasonable attorney fees," and therefore "courts do not have discretion to decide whether to award reasonable attorney fees to the 'successful party.'" *A.K. & R. Whipple Plumbing & Heating v. Guy,* 2004 UT 47, ¶ 7, 94 P.3d 270. "[A] 'successful party [under Utah Code section 38–1–18] includes one who successfully enforces or defends against a lien action.'" *Id.* (quoting *Kurth v. Wiarda,* 1999 UT App 335, ¶ 9, 991 P.2d 1113). "[T]he term 'successful party' is essentially synonymous with the term 'prevailing party'" as used in other attorney fee contexts. *Id.* ¶ 8 (citation omitted). "To be a prevailing party, a party 'must obtain at least some relief on the merits' of the party's claim or claims." *Ault v. Holden,* 2002 UT 33, ¶ 48, 44 P.3d 781 (citation omitted).

¶ 33 At oral argument, Uhrhahn argued that if we conclude it did not timely file its mechanic's lien enforcement action, then the trial court did not have jurisdiction to hear the issue or award attorney fees under the statute. Accordingly, it asserts that the homeowners would not be entitled to attorney fees for prevailing on appeal. The homeowners, on the other hand. argued that because section 38–1–18 does not mention jurisdiction, if they successfully defend against the action on any basis they are entitled to attorney fees. In *AAA Fencing Co. v. Raintree Development & Energy Co.,* 714 P.2d 289 (Utah 1986), the Utah Supreme Court agreed with other jurisdictions that have held that if a mechanic's lien enforcement action is not timely filed, the trial court does not have jurisdiction. *See id.* at 290–92. In that case, however, upon concluding that the mechanic's lien was not timely filed, the court awarded attorney fees to the defendant as the successful party.[12] *See id.* at 292. Accordingly, Uhrhahn's argument that the court has no jurisdiction to award attorney fees when a defendant proves the mechanic's lien enforcement action was not timely filed is without merit.

¶ 34 The more interesting issue in this case is whether the homeowners actu-

---

12. At that time, section 38–1–11 required the enforcement action to be brought within twelve months after the completion of the original contract. *See AAA Fencing Co. v. Raintree Dev. & Energy Co.,* 714 P.2d 289, 290 n. 1 (Utah 1986) (quoting the version of Utah Code section 38–1–11 in effect at that time). However, the same principles apply even though the time requirements are different in this case.

ally succeeded on the merits of their claim. This case presents a somewhat unusual circumstance because the homeowners prevailed on appeal, not so much because they succeeded in proving the lien action was untimely, but because the trial court erred by failing to enter material factual findings and because Uhrhahn's appellate strategy worked to the homeowners' advantage, leaving the homeowners' characterization of the record unrefuted. However, while the homeowners' victory was as much a result of luck as anything, based on precedent we conclude that the homeowners were the successful party under the statute.

¶ 35 The Utah Supreme Court has previously determined that a defendant is entitled to attorney fees when the plaintiff voluntarily dismisses its forfeiture action before the district court had a chance to consider it. *See State v. One Lot of Pers. Prop.*, 2004 UT 36, ¶¶ 18–19, 90 P.3d 639. The Court in *One Lot* disagreed with the plaintiff's argument that the defendant had not obtained any relief on the merits of its claim. *See id.* ¶ 18. While the Supreme Court did not elaborate on why the defendant had succeeded on the merits, it stated:

> The fact that the [plaintiff] recognized the apparent weakness of its claim and voluntarily dismissed it before the district court had an opportunity to do likewise does not relieve the [plaintiff] of its obligation to reimburse the [defendants] for their attorney fees. Any other rule would be fundamentally unfair to those defendants who are required to incur substantial fees defending a plaintiff's non-meritorious claims up to the point of the plaintiff's voluntary dismissal.

*Id.* ¶ 19. Based on the logic of *One Lot*, we conclude that even though the homeowners' success on the mechanic's lien issue was a result of the errors or inaction of others, they were the successful party for purposes of Utah Code section 38–1–18. We accordingly remand for a determination of their attorney fees incurred *solely* in refuting the timeliness of the mechanic's lien enforcement action— the only issue on which they can be said to have prevailed. *See Ellsworth Paulsen Constr. Co. v. 51–SPR, LLC*, 2006 UT App 353, ¶ 47, 144 P.3d 261 ("[U]nder the mechanic's lien statute [a successful party] is not entitled to attorney fees incurred in pursuing its nonlien claims which were completely separate[.]") (citation and internal quotation marks omitted), *cert. granted*, 150 P.3d 544 (Utah 2006). We have previously held that when a "breach of contract claim . . . [is] so inextricably tied to [a] mechanic's lien claim," a court may lump fees for both claims together and award all such fees to the successful party pursuant to the mechanic's lien statute. *Ellsworth Paulsen Constr.*, 2006 UT App 353, ¶ 47, 144 P.3d 261. In this case, however, the issues are not so linked and, indeed, the homeowners did not prevail on the merits of the contract claims. Accordingly, they are not entitled to any fees incurred in defending against the substantive merits of the breach of contract claims, even insofar as they have some ancillary connection to the mechanic's lien claims. While it should go without saying, we note that the fees attributable to defending against the timeliness of the mechanic's lien action, both below and on appeal, will be comparatively minimal.

## CONCLUSION

¶ 36 We affirm the trial court's determination that Hopkins, through his conduct, created an implied-in-fact contract that allowed the parties to orally agree to extras or changes to the original proposal agreement. We also affirm the trial court's damages award because it is supported by the trial court's implicit factual findings. We reverse the trial court's determination that Uhrhahn prevailed on its mechanic's lien enforcement action because Uhrhahn failed to adequately brief the timeliness issue and because no factual findings, explicit or implied, support a determination that the mechanic's lien enforcement action was timely filed. Likewise, we vacate the trial court's award of attorney fees to Uhrhahn under the mechanics' lien statute since it is not the successful party as concerns the lien enforcement action. Finally, we remand to the trial court for a determination of the homeowners' attorney fees, confined to those fees incurred in defending against the timeliness of the mechanic's lien enforcement action, since they are the suc-

cessful party under the mechanics' lien statute to that limited extent.

¶ 37 WE CONCUR: JUDITH M. BILLINGS, Judge, and CAROLYN B. McHUGH, Judge.